## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TONI LYNN CHARLES**                                      **CIVIL ACTION**

**VERSUS**                                                        **NO. 08-40**

**JETBLUE AIRWAYS CORPORATION**                    **SECTION "K"(5)**

## ORDER AND REASONS

Before the Court is Defendant JetBlue Airways Corporation's ("JetBlue") Motion for Summary Judgment.  (Rec. Doc. 20) ("Mot.").  Plaintiff Toni Lynn Charles has filed an opposition to JetBlue's motion.  (Rec. Doc. 21) ("Opp.").  JetBlue subsequently filed a reply. (Rec. Doc. 29) ("Reply").  Having reviewed the briefs, factual submissions, and the relevant law, this Court will grant JetBlue's motion in part and deny it part.

## I.  FACTUAL BACKGROUND

The following facts are undisputed, unless otherwise noted.  Plaintiff began her employment with JetBlue on March 3, 2005 in the Customer Crew Airport Operations at New Orleans Airport.  She was hired by General Manager John Watts, with whom she had previously worked at Airtran Airways for approximately three years.  Watts was her direct supervisor. Plaintiff also reported to supervisors Semaj Brown, Jeffrey Palmquist, and Lead Brandi Dortch. Watts and Palmquist are Caucasian; Brown and Dortch are African American.  Plaintiff was

hired as a part-time crewmember, but she had frequent opportunities to work additional shifts, and she took advantage of those opportunities throughout her employment with JetBlue.

During the summer of 2005, JetBlue began increasing its staff in New Orleans in anticipation of adding two daily flights to New Orleans airport.  However, in August 2005, Hurricane Katrina struck New Orleans.  New Orleans airport closed temporarily after the storm. JetBlue, which had operated three daily flights before the hurricane, cancelled all flights for one month.  During this period, JetBlue continued to employ all of its crewmembers, including Plaintiff, paying them for any time missed from work during the airport's closure.  In October 2005, JetBlue resumed one flight a day out of New Orleans, increasing to two daily flights in January 2006.  Only in September 2007 did the company resume its pre-hurricane schedule of three flights per day.  Due to this period of reduced JetBlue service of New Orleans, the JetBlue New Orleans station was overstaffed.  Staff often worked overlapping shifts regularly, and Plaintiff frequently worked with fellow employee Sandy Lassen.  Overall, there were fewer extra shifts for Plaintiff, who was a part-time employee, to pick up.  JetBlue alleges that Plaintiff's pay records show that, despite the work reduction, Plaintiff worked more hours, on average, in 2006 than in 2005.  Watts Aff. ¶ 6.  Despite this overall increase in hours worked by Plaintiff, she contends that her hours were reduced beginning in April 2006.  Watts Depo., Ex. B.  In March 2006, Plaintiff applied for a promotion to JetBlue's Jacksonville, Florida station.  Plaintiff's supervisor John Watts completed the necessary paperwork to permit her to interview for the position.  Watts Aff., Ex. C.  She did not receive the promotion, however.

On August 16, 2006, Plaintiff was on her way to a gate to assist with a JetBlue flight. She was required to pass through the security checkpoint operated by the Transportation Security Administration ("TSA"). Plaintiff apparently did not believe she was required to remove her shoes, and she disputed this fact with the TSA agent who had directed her to do so. JetBlue alleges that Plaintiff uttered a profanity, although in a later written statement she asserted that the profanity was not aimed at the agent. In Plaintiff's deposition, however, she claimed that she did not utter any profanities. Pl. Depo. 163:21-164:5. Subsequent to this incident, JetBlue alleges that Plaintiff bragged about the altercation with the TSA agent to two of her co-workers. The TSA agent filed a complaint, which was passed along to JetBlue. TSA permitted John Watts to review the videotape of the incident. The tape had no sound, but apparently showed Plaintiff "appearing speaking in a very animated, angry manner to the agent," including "jabbing her finger at the TSA agent." Watts Aff. ¶ 13. Watts asked Plaintiff about the incident, and she allegedly provided a significantly different account compared to her statements to her coworkers, Sandy Lassen and Alan Pilgreen. Watts Aff. ¶ 11. Watts asked Plaintiff to make a written statement concerning the incident. Watts Aff. ¶ 11, Ex. D. Due to the alleged disparity in Plaintiff's accounts of the incident, Watts asked Lassen and Pilgreen to make written statements of what Plaintiff had told them. Watts Aff. ¶ 12, Ex. E.

Based on the information he had received, Watts referred the matter to his Regional Manager, Peter Diaz, who commenced an investigation. Watts Aff. ¶ 16. It was initially referred to JetBlue's Corporate Security Department due to concerns that TSA may make a formal complaint, which would lead to sanctions against the company. Watts Aff. ¶ 17. The investigation was later referred to JetBlue's "People Department," which is the company's

human resources department. Watts Aff., Ex. G. During the investigation, Plaintiff was suspended according to company policy. Watts Aff., Ex. H. Watts collected statements from three of Plaintiff's witnesses, the TSA agent, Plaintiff, Lassen and Pilgreen. Watts Aff. ¶19. Based on the videotape and the relevant statements about the incident, JetBlue's human resources department determined that Plaintiff had violated JetBlue's Integrity policy and that she had exhibited inappropriate behavior toward a business partner. Watts recommended terminating Plaintiff's employment. Watts Aff. ¶ 20. Scott Link, the director of JetBlue's East Blue Cities department and supervisor to Mr. Watts, supported this decision. Watts Aff. ¶ 22, Ex. J.

After being informed of her discharge, Plaintiff requested a post-termination review. The review was conducted by John Siderakis, a member of JetBlue's People Department who had not been involved in the investigation into Plaintiff's conduct. Watts Aff. ¶ 23; Def. SOF ¶ 27. Mr. Siderakis upheld the decision to terminate Plaintiff's employment. Watts Aff. ¶ 23, Ex. K. Plaintiff was discharged on October 5, 2006, and subsequently filed the present lawsuit on January 3, 2008.

## II. ANALYSIS

Under Rule 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Taylor v. United Parcel Serv., Inc.*, --- F.3d ----, 2008 WL 5401487, at *3 (5th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). This Court will "construe the evidence in the light most favorable to [the Plaintiff] and

draw all reasonable inferences in [her] favor."  *Roberson v. Alltel Information Servs.*, 373 F.3d

647, 651 (5th Cir. 2004).

Plaintiff has presented the following claims for relief.  First, she makes allegations under

Title VII of the Civil Rights Act of 1964 and Louisiana anti-discrimination law, specifically a

harassment/hostile work environment claim based upon race and national origin, a discrimination

claims based on race and national origin, and a retaliation claim.  She also alleges that the

conduct of JetBlue's employees constituted the tort of intentional infliction of emotional distress.

These claims will be addressed seriatim.

**A.  Title VII and Louisiana Anti-Discrimination Claims**

Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964 and Louisiana law.

Specifically, she asserts that she faced race and national origin-based harassment from fellow

employees in the form of epithets, which created a hostile work environment; she suffered

adverse employment actions after she complained about the harassment; and she suffered

adverse employment actions due to race and national origin-based discrimination.  As noted by

the Fifth Circuit, "The Supreme Court recently emphasized the paramount role that juries play in

Title VII cases, stressing that in evaluating summary judgment evidence, courts must refrain

from the making of '[c]redibility determinations, the weighing of the evidence, and the drawing

of legitimate inferences from the facts,' which 'are jury functions, not those of a judge.'"

*Fierros v. Texas Dep't of Health*, 274 F.3d 187, 190-91 (5th Cir. 2001) (quoting *Reeves v.

Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

Louisiana's anti-discrimination statute is "substantively similar" to Title VII, and Louisiana courts "routinely look to the federal jurisprudence for guidance;" accordingly, Plaintiff's hostile work environment, retaliation, and discrimination claims will be evaluated under federal precedents. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 n.4 (5th Cir. 2007) (citing *Trahan v. Rally's Hamburgers, Inc.*, 696 So.2d 637, 641 (La. App. 1st Cir. 1997)).

### 1. National Origin-Based Claims

Prior to considering Plaintiff's race-based claims, it should first be noted that Plaintiff also alleges that she faced discrimination and harassment based upon her national origin as a "black female" who was born in the United States. Pl. Depo. 7:16-20. To plead a discrimination or harassment claim based upon national origin, a plaintiff must allege facts showing that such discrimination or harassment was based upon a national origin. *See Boroujerdi v. Miss. State Univ.*, No.100CV253DD, 2002 WL 31992185, at *1 (N.D. Miss. Oct. 28, 2002) (denying summary judgment on Title VII national origin discrimination claim where plaintiff was native of Iran); *Yousuf v. UHS of De La Ronde, Inc.*, No. Civ. A. 97-0614, 1999 WL 127248, at *3 (E.D. La. Mar. 8, 1999) (Livaudais, J.) (reversing prior grant of summary judgment for defendant where plaintiff, who was of Asian-Indian descent, alleged he had been subjected to national origin-based discrimination). The harassment need not be based upon the Plaintiff's *actual* nationality, but "[i]t is enough to show that the complainant was treated differently because of his or her foreign accent, appearance, or physical characteristics." *WC&M*, 496 F.3d at 401 (quoting Guidelines on Discrimination Because of National Origin, 45 Fed. Reg. 85,632, 85,633 (Dec. 29, 1980)). It does not appear, however, that any harassment was directed at Plaintiff due

to her perceived national origin, but rather due to her race.  *See id.* at 402 (permitting national origin-based claim where plaintiff was harassed because he was an "Arab" and was told "This is America. . . . not the Islamic country where you come from.").  Thus, her nation origin-based claims appear at best to be simply duplicative of her race-based claims, and accordingly summary judgment shall be granted on the national origin-based discrimination and harassment claims.

### 2.  Race-Based Harassment/Hostile Work Environment Claim

To establish a claim for a hostile work environment claim under Title VII, "the plaintiff must show that: (1) the victim belongs to a protected group; (2) the victim was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the victim's employer knew or should have known of the harassment and failed to take prompt remedial action." *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007) (citations omitted).

Plaintiff claims that her coworkers subjected her to race-based and national-origin based harassment.  Compl. ¶ 7.  With regards to her claim of race-based harassment, it appears uncontested that Plaintiff, an African-American woman, is a member of a protected race group.  Moreover, viewing the evidence in the light most favorable to the Plaintiff, she recounts numerous instances where Sandy Lassen used racial epithets towards her.  Pl. Depo. 9:9-13 ("Stupid ass niggers don't never come pick up their children on time.").  This coworker would also refer to other African-American persons as "your people."  For instance, she would refrain from assisting African-American passengers, instead requiring Plaintiff to assist them because,

7

Ms. Lassen stated, "I'm not helping.  Those are your people.  You help them."  Pl. Depo. 16:6-16; *see* Pl. Depo. 10:23-11:7 ("[Y]ou people just go to New York and buy all this fake stuff and come down here and try to sell it.").  Angela Kittles, another African-American JetBlue employee, corroborates Plaintiff's allegations that Lassen and other employees made racist remarks towards African-Americans.  Kittles Depo. 15:20-16:5 (Ms. Lassen calling male African-American customer a "stupid nigger"); Kittles Depo. 27:8-15 (Mr. Palmquist stating "Black people are so . . . lazy").  Kenya Morgan, also an African-American JetBlue employee, likewise corroborates these allegations.  Morgan Depo. 221:12-222:9 (recounting use of "stupid nigger").  In light of Plaintiff's specific allegations, along with other instances recounted by other witnesses, this Court finds this evidence adequate to withstand summary judgment on the second and third prongs: that Plaintiff was subjected to unwelcome harassment, and that such harassment was based upon that protected characteristic.  *See Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005) ("We have previously observed that racial epithets undoubtedly demonstrate racial animus."); *see also Wallace v. Texas Tech University*, 80 F.3d 1042, 1049-50 (5th Cir. 1996) (granting summary judgment where plaintiff could not produce another witness who heard employee "make racial remarks or demean anyone because of his or her race.").

Plaintiff must also sufficiently allege the fourth factor, that "the harassment affected a term, condition, or privilege of employment."  *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 655 (5th Cir. 2002), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).  To affect a term or condition of employment, the harassment must be "severe or pervasive."  *Harvill v. Westward Commc'ns,*

*L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005).  "The environment must be deemed 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 479 (5th Cir. 2008), *quoting Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

The Fifth Circuit discussed this factor in *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 399 (5th Cir. 2007).  In that case, the plaintiff, who was born in India and was a practicing Muslim, alleged that his fellow employees began harassing him subsequent to the attacks of September 11, 2001, calling him "Taliban" and "Arab", among other epithets.   After being fired from his job, the plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), which brought suit against plaintiff's employers.  The district court granted summary judgment to the defendant's on the complainant's hostile work environment claim, reasoning that the harassment was not "so severe that it kept him from doing his job." *Id.* at 400.  On appeal, the Fifth Circuit found that the district court applied the wrong standard, and instead should have evaluated the "totality of the circumstances" in determining whether the harassment impacted a condition of employment, noting that "a regular pattern of frequent verbal ridicule or insults sustained over time can constitute severe or pervasive harassment sufficient to violate Title VII." *Id.*  The court cited instances where harassment over a three-year period, or repeated harassment two to three times per week could constitute "severe or pervasive harassment." *Id.*  (citing *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (racial harassment over three year period), and *Farpella Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996) (sex-based harassment two to three times per week)).  In evaluating the case

at hand, the Fifth Circuit found that the plaintiff had suffered frequent verbal harassment "for a period of approximately one year," and it concluded that "[a]lthough no single incident of harassment is likely sufficient to establish severe or pervasive harassment, when considered together and viewed in the light most favorable to the EEOC, the evidence shows a long-term pattern of ridicule sufficient to establish a claim under Title VII." *Id.* at 400-01; *see also Aryain*, 534 F.3d at 479 (finding that plaintiff subjectively perceived her work environment as hostile where plaintiff told supervisor that she was being harassed, she did not want to work alone with her supervisor, and "felt humiliated every time he made one of his sexually-charged comments.").

   The present case presents a close call on this issue, but the Court will rule in favor of the Plaintiff.  She was hired on a part-time basis by JetBlue on March 3, 2005.  Plaintiff claims that Sandy Lassen's harassment began soon thereafter, at which time she complained to her superiors.  Pl. Depo. 19:19-20:10.  Plaintiff claims that the racist remarks began during the middle of her tenure, when she began working after Hurricane Katrina and had shifts that frequently overlapped with Sandy Lassen.  Plaintiff was suspended from work in August 2006. Therefore, at the maximum, it appears that Plaintiff faced harassment for approximately a year and a half.  During this period, Plaintiff alleges that she was subjected to epithets regarding African-Americans, particularly frequent use of the term "nigger."  Regardless of whether these epithets were directed at Plaintiff or toward other persons while in Plaintiff's presence, these derogatory remarks were allegedly made on a regular basis, and accordingly could reach the level of severe and pervasive harassment.  Ms. Lassen further told Plaintiff that she didn't want to work with her and that she was "tired of seeing [Plaintiff's] face here."  Pl. Depo. 17:20-23.

JetBlue attempts to refute Plaintiff's claim by pointing out that Plaintiff testified that she "greatly enjoyed her work with JetBlue," Mot. at 18, citing Plaintiff's testimony that she wanted to stay at JetBlue because she "[a]bsolutely loved it." Pl. Depo. 118:22-119:2. However, it appears that working with Ms. Lassen was particularly difficult, and prior case law shows that a claim for harassment can be founded upon a plaintiff's avoidance of a particular coworker. *See Aryain*, 534 F.3d at 479 (plaintiff avoided working with abusive supervisor). Moreover, Plaintiff alleges that she complained verbally to her supervisors on more than one occasion, providing additional evidence that she subjectively felt harassed. Pl. Depo. 23:24-24:9. Her decision to continue working appears to have been financially motivated, as Plaintiff testified that she regularly sought additional shifts. This Court is aware that "Title VII . . . is not a 'general civility code,' and 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment." *Lauderdale v. Tex. Dep't of Criminal Justice, Institutional Div*., 512 F.3d 157, 163 (5th Cir. 2007) (quoting *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275)). It should be noted further that Ms. Lassen vehemently denies making any derogatory comments whatsoever towards the Plaintiff. However, viewing the evidence in the light most favorable to the Plaintiff, this Court concludes that these frequent racist comments as alleged by Plaintiff could form the basis for a jury verdict that the harassment was severe and pervasive, and therefore it affected a term, condition, or privilege of employment.

Lastly, Plaintiff has sufficiently alleged that her supervisors "knew or should have known of the harassment and failed to take prompt remedial action." *WC&M Enters.*, 496 F.3d at 399.

Again, taken in the light most favorable to the non-moving party, she asserts that she complained to John Watts soon after having first heard the harassing comments, and John Watts "didn't say anything to [Ms. Lassen]." Pl. Depo. 19:19-20:11. Later during her employment, Plaintiff complained to Semaj Brown that Ms. Lassen had told Plaintiff to attend to black customers because they were "your people," and Ms. Brown made no apparent response. Pl. Depo. 22:15-23:13. Plaintiff complained to Peter Diaz and Linda Daire, who stated that they would respond to the situation, but Ms. Lassen's behavior continued. Pl. Depo. 24:13-25:11. The Fifth Circuit has held that measure of an employer's response must be flexible depending on the harassment level. *Waltman*, 875 F.2d at 479 ("What is appropriate remedial action will necessarily depend on the particular facts of the case – the severity and persistence of the harassment, and the effectiveness of any initial remedial steps."). However, the alleged inaction by management here was arguably insufficient. *See id.*, *citing DeGrace v. Rumsfeld*, 614 F.2d 796, 805 n.5 (1st Cir. 1980) (concluding that "more than mere verbal chastisements of those employees who used racial epithets was needed in order for [the defendant] forcefully to convey the message that racism would not be tolerated."). Any dispute regarding the adequacy of management's response is a factual issue for the jury. See *Hayes v. Laroy Thomas, Inc.*, No. 5:05CV195, 2007 WL 128287, at *20 (E.D. Tex. Jan. 11, 2007) (finding question of fact regarding "whether Defendant's refusal to impose any disciplinary action upon [employee] following its investigation is reflective of its failure to take prompt remedial action."). Therefore, Defendant's motion for summary judgment will be denied as it relates to Plaintiff's hostile work environment claim.

### 3. Retaliation Claim

Plaintiff next asserts that JetBlue supervisors retaliated against her for complaining to her superiors about the racial harassment at JetBlue.  She claims that the retaliated against her in the following ways: her assigned work hours and compensation were reduced, she received a less desirable work assignment, she did not receive a promotion, she was not put in the position to receive a promotion, she was not provided a uniform name tag, and she was discharged.  A plaintiff "may prove a claim of intentional discrimination or retaliation either by direct or circumstantial evidence."  *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  Cases based upon circumstantial evidence are analyzed "under the framework set forth in *McDonnell Douglas Corp. v. Green*."  *Id.* (citing *McDonnell Douglas*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).  To establish a claim of retaliation under Title VII, "a plaintiff must show that: (1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action."  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).  "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action."  *McCoy*, 492 F.3d at 557.  "The employer's burden is only one of production, not persuasion, and involves no credibility assessment."  *Id.* (citing *Russell v McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)).  "If the defendant makes the required showing, the burden returns to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for the real, discriminatory reason."  *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001).  "To carry this burden, the plaintiff must

rebut each nondiscriminatory or nonretaliatory reason articulated by the employer." *McCoy*, 492

F.3d at 557 (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2008)).

"Direct evidence is "evidence which, if believed proves the fact of discriminatory animus

without interference or presumption." *Admire v. Strain*, 566 F. Supp. 2d 492, 500 (E.D. La.

2008) (Duval, J.) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir.

2002)).  Plaintiff asserts that the retaliatory intent of her superiors is revealed in an email sent by

Sandy Lassen to John Watts after her termination, in which Lassen express her apparent approval

that JetBlue was "getting rid of the trouble makers at our station starting with Toni Charles and

then Kenya [Morgan] and Angie [Kittles]."  Watts Depo., Ex. A-1.  Ms. Morgan and Ms. Kittles,

like Plaintiff Toni Charles, are African-American, and Plaintiff alleges that this email shows that

John Watts intended on retaliating against Plaintiff for her complaints.  Plaintiff is misdirected,

however, as this email, at best, shows the Ms. Lassen had some animosity towards her

coworkers.  It does not show that Mr. Watts shared that animosity.  Indeed, in this email Lassen

expresses her dismay to Watts that Morgan and Kittles were permitted to return to work despite

allegedly clocking in for each other at work, which apparently is against JetBlue policy.  This

suggests some disagreement between Watts and Lassen, which only further musters against

imputing Lassen's alleged intent to Watts.  Plaintiff has not alleged any other direct evidence,

such as racial slurs, that would connote any race-based animus by Watts or any other JetBlue

supervisor who had a role in any adverse employment action.  *See Brown v. East Miss. Elec.*

*Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (supervisor's "routine use of racial slurs

constitutes direct evidence that racial animus was a motivating factor in the contested

disciplinary decisions.").  Therefore, this Court finds no valid direct evidence of any supervisor's intent to discriminate, and accordingly it will proceed to the *McDonnell Douglas* analysis.

The first requirement of *McDonnell Douglas* requires that the Plaintiff engaged in a protected activity.  Plaintiff alleges that her protected activity was complaining to management regarding the hostile work environment allegedly created by Ms. Lassen.  There appears to be no dispute that complaining to management regarding hostile work conditions is a protected activity.  42 U.S.C. § 2000e-3(a); *see Green*, 284 F.3d at 657 (complaining to superiors regarding discrimination qualifies as a protected activity).  Therefore, the Court will proceed to the last two prongs of this test.

As to the adverse employment action factor, the Supreme Court in has described this a "tangible employment action," defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (quoted by *Mota v. University of Tex. Houston Health Science Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001)).  More recently, the Supreme Court refined this standard in *Burlington Northern & Santa Fe Railway Co. v. White*, holding that in order to establish an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (citation and internal quotation marks omitted).  The Court noted that this standard requires that the action be *materially* adverse from an *objective* standpoint.  *Id.*

Several of Plaintiff's claims do not fulfill the adverse employment action requirement. Plaintiff asserts that she was unfairly assigned different responsibilities, to wit, working at the JetBlue gate as opposed to the JetBlue ticket counter where Ms. Lassen was regularly assigned. The Supreme Court noted that "reassignment with significantly different responsibilities" can qualify as a tangible employment action. The responsibilities here do not appear to be significantly different; indeed, it appears that working at the gate and the ticket counter entailed similar duties. In other words, under the *Burlington Northern* standard, Plaintiff has only plead that working at the ticket counter was preferable, but has not suggested any difference in prestige or the difficulty of the duties. *See Burlington Northern*, 548 U.S. at 71, 126 S.Ct. 2405 (finding material issue of fact where plaintiff was reassigned from forklift operator to track laborer because forklift operator had "an indication of prestige" and laborer duties "by all accounts [were] more arduous and dirtier."). Plaintiff also alleges that "[o]n one occasion, uniform nametags were ordered for other employees but not for [her]." Opp. at 7. The Supreme Court in *Burlington Northern* explained that the adverse employment action must be material, explaining that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. *Burlington Northern*, 548 U.S. at 68, 126 S.Ct. 2405. No amount of torsion can make this allegation fit within the definition of a *materially* adverse decision; it is, at best, unfortunate but trivial.

Reduced work hours certainly would appear to be an adverse employment action. However, Plaintiff has not adequately established a factual basis that she indeed did work fewer hours and received less compensation. She claims that her work hours were substantially

reduced in April 2006, after she complained to management regarding Ms. Lassen. However, Plaintiff originally complained in early 2005 regarding Lassen, after which she does not allege that she suffered any retaliation regarding her work hours. More to the point, documentary evidence supplied by JetBlue shows that Defendant received $13,854.43 for ten months of employment in 2005, and then after her complaints, she received $13,544.91 for nine months of employment. Watts Aff., Ex. B. A difference of approximately $310, or a 2% reduction in salary for a part-time worker is not a material difference; again, it is at best a trivial difference. Accordingly, Plaintiff's claim that she suffered an adverse employment action through a reduction in work hours is absolutely meritless.

Three of Plaintiff's allegations, namely her denial of a promotion, her denial of the opportunity to gain experience that would lead to a promotion, and her discharge, would appear to arguably raise an issue of fact regarding whether they were objectively material adverse employment decisions. Plaintiff must establish a causal link between the adverse employment action and her protected activity. "The causal link required by the third prong of the prima facie case does not rise to the level of a 'but for' standard." *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002); *see McCullough v. Houston County, Tex.*, No. 07-40949, 2008 WL 4613697, at *6 (5th Cir. Oct. 16, 2008) (same). "Causation can be established through direct or circumstantial evidence." *Campbell v. England*, 234 Fed. Appx. 183 (5th Cir. 2007) (citing *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414-15 (5th Cir. 2003)).

After reviewing the allegations and relevant evidence provided in this case, this Court concludes that Plaintiff cannot adequately allege that the adverse employment actions were caused by her complaints. Her discharge, while indeed an adverse action, was not caused by her

complaints. One way that a plaintiff can establish causation is through temporal proximity. "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (quoting *Swanson v. Gen. Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir. 1997)). However, "the mere fact that some adverse action is taken *after* an employee engages in some protected activity will not *always* be enough for a *prima facie* case." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 655 (5th Cir. 2004) (quoting *Swanson,* 110 F.3d at 1188 n.3); *McCullough*, 2008 WL 4613687, at *7 ("In this circuit, temporal proximity alone will not suffice to establish the requisite but-for causation."). Plaintiff here cannot allege any kind of temporal proximity. Her first complaint allegedly was made soon after she commenced employment in March 2005. She then asserts that she complained again later, but she cannot affix any date certain to those complaints. Her discharge occurred in August 2006. The Fifth Circuit has not provided absolute boundaries regarding proximity, noting, "[A] time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Evans*, 246 F.3d at 354 (citations omitted). *But see Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002) (five month lapse between protected activity and retaliation does not, on its own, establish inference of causation). Here, Plaintiff's vague allegations regarding the timing of her verbal complaints cannot form the basis for proving causation by proximity. At best, she can only allege a lapse of 17 months, which is not nearly proximal enough to allege causation. The much more closer event is the TSA incident, after which she was almost immediately suspended and then discharged after an investigation. Watts relied on statements by Plaintiff's coworkers and the TSA agent who had been the subject of

Plaintiff's alleged vituperation. Watts Aff. ¶ 12. He further reviewed a video that appeared to confirm these statements. Watts Aff. ¶ 13. The TSA agent also provided a written account that was submitted to Watts for his review. Watts Aff., Ex. F. The discharge decision was affirmed by JetBlue's People Department, specifically being approved by Scott Link, Director of East Blue Cities. Watts Aff. ¶ 22, Ex. J. It is undisputed that upon Plaintiff's request, JetBlue had a review of Plaintiff's discharge performed by a personnel department representative in New York who had no connection to the TSA incident. That representative affirmed the discharge decision. Watts Aff. ¶ 23, Ex. K. No evidence suggests that these senior officials had any knowledge of Plaintiff's complaints. *See Earle v. Aramark Corp.*, 247 Fed. Appx. 519, 524 (5th Cir. 2007) (finding no causation because "[i]t is undisputed that the decision-makers at Aramark had no knowledge of [the plaintiff's] complaints."). To the contrary, the relevant proof indicates that the much more plausible and proximal cause of her discharge was her confrontation with the TSA agent. *See Smart v. Geren*, No. 08-50448, 2008 WL 5180334, at *2 (5th Cir. Dec. 10, 2008) (per curiam) (no causal link in retaliation claim where "record demonstrates that [plaintiff's] non-selection [for job] was based on his termination from his earlier position, at which he had falsely claimed still to be working."). Even if Plaintiff's allegations could establish a prima facie case, she cannot adequately allege that the TSA incident was pretext for retaliation under the *McDonnell Douglas* framework. No evidence shows that Watts held any retaliatory animus towards Plaintiff, and the fact that JetBlue corporate personnel officers approved of the discharge further rebuts any pretext argument. As presented here, the relevant proof shows that the TSA incident was the sole motivating factor, and therefore Plaintiff cannot assert that her discharge was retaliatory.

Plaintiff claims that she did not receive a promotion because she complained to management. She also claims that she was not allowed to temporarily supervise her station because of her complaints. Again, her vague allegations regarding timing cannot establish adequate proximity between her complaints and her denial of a promotion or her denial of the opportunity to supervise the station. She also asserts that John Watts gave a negative review of her to the hiring official from the JetBlue Jacksonville office. Plaintiff bases her claim on the fact that the hiring official told her that she did "really well on the interview," and that John Watts allegedly did not forward paperwork to that official. Pl. Depo. 47:2-25. However, Plaintiff admits that Mr. Watts did eventually submit the proper paperwork. Most pointedly, she also stated, "I'm saying that I didn't get the position because someone else may have been better qualified." Pl. Depo. 47:21-23. Similarly, Plaintiff cannot allege any other causal connection between her protected activity and the infrequency with which she was permitted to work as acting supervisor. Because Plaintiff cannot provide any evidence, direct or circumstantial, that she was denied a promotion for reasons other than due to merit, she fails to establish any causal connection between her protected activity and the alleged adverse employment decision.

### 4. Race-Based Discrimination Claim

Plaintiff further claims that JetBlue's management discriminated against her based upon her race. To establish a prima facie case for race discrimination, "a plaintiff must show he or she was: (1) a member of a protected class; (2) qualified for the position held; (3) subject to an adverse employment action; and (4) treated differently from others similarly situated." *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005). As with a retaliation claim, "[a]

plaintiff can prove intentional discrimination through either direct or circumstantial evidence." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). Where plaintiff cannot provide direct evidence of discrimination, again the *McDonnell Douglas* framework applies. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). There appears no dispute that Plaintiff, an African-American woman, is a member of the protected class. Because this Court has already ruled that most of Plaintiff's claims do not amount to an adverse employment action, this Court will focus on the three allegations that could qualify as adverse employment action: that Plaintiff was discriminated against due to her race because she did not receive a promotion, she was not given the opportunity to seek a promotion, and she was discharged.

As to direct evidence, Plaintiff does suggest that some employees other than Ms. Lassen made race-based remarks. Plaintiff claims that Jeffrey Palmquist refused to hire an African-American male for a public relations job because he had dreadlocks that could "scare" customers, and he suggested that Plaintiff and other African-American female employees may "fight" over this applicant if he were hired. Pl. Depo. 35:6-36:15. Palmquist also allegedly told Andrea Kittles another African-American employee, that "[b]lack people are so . . . lazy." Kittles Depo. 26:25-27:15. Palmquist's statements, while apparently race-based, cannot be inferred to John Watts who was Palmquist's supervisor, Kittles Depo. 28:10-12, and who was the person who recommended that Plaintiff be discharged. As Palmquist was not one of the decision-makers involved in any of the adverse employment actions, and therefore his statements are not relevant to this inquiry. *See Crawford v. U.S. Dep't of Homeland Sec.*, 245 Fed. Appx. 369, 378 (5th Cir. 2007) (finding investigator's allegedly discriminatory statements did not

provide proof of discriminatory intent because he "was not the decision-maker in this case.").

Plaintiff also claims that John Watts referred on one instance to Mexicans as "wetbacks," Pl.

Dep. at 27:20-22, and that he told Kenya Morgan in 2003 that he would "get rid of everyone of

us," which she claims to have interpreted as a reference to African-American employees,

Morgan Depo. 18:12-19:8. Andrea Kittles, another African-American employee, asserts that

Watts told Semaj Brown not to pay Kittles for her overtime hours at some point in early to mid-

2008, although Kittles does not recall any reference to race and notes that she was indeed paid

aforesaid overtime hours. Kittles Depo. 77:12-79:16. This evidence is not adequate to rise to the

level of any inference of racial motive. Instead, it suggests one instance of Watts' use of a racial

epithet, but one that was not directed towards anyone of the same race as Plaintiff. "Stray

remarks," moreover, "are insufficient to create an inference of [] discrimination." *Wyvill v.*

*United Companies Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000). Plaintiff would have this

Court infer that a statement made to Morgan in 2003 implied a race-based motive, but such an

inference would require a sizeable leap, and nonetheless it would be difficult to apply a statement

from 2003 to Plaintiff's claim for discrimination arising three years later. Indeed, this Court will

not pile inference upon inference, particularly where Plaintiff admits that it was John Watts who

arranged for her to gain employment with JetBlue in 2005. Pl. Depo. 41:16-23.

Plaintiff fails to establish the prima facie case using circumstantial evidence substantially

because she cannot show that she was treated differently from other employees. "An employee

is similarly situated if that employee was under 'nearly identical' circumstances." *Jones v. Wal-*

*Mart Stores, Inc.*, No. 08-10115, 2009 WL 27475, at *2 (5th Cir. Jan. 6, 2009) (quoting *Okoye v.*

*Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001)). "Or put another way,

the conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wallace*, 271 F.3d at 221.  With regards to her claim that she was denied a promotion, Plaintiff does not provide any evidence of that a person was hired for the Jacksonville position who was lesser qualified than she was.  As far as her claim that she was denied the opportunity to regularly work as a supervisor because of Sandy Lassen's dislike for working with her, Plaintiff can only speculate that those of the same qualifications were permitted such an opportunity; indeed, Plaintiff by all accounts was one of the few relatively junior part-time employees.  *Campbell v. Griffin*, 265 Fed. Appx. 269, 270 (5th Cir. 2008) (affirming summary judgment and finding that "speculative contentions regarding how other employees were treated are not sufficiently supported as to create a genuine issue of material fact.").  Plaintiff moreover cannot assert that she was treated differently in being discharged for her public argument with a TSA employee.  She attempts to limn a picture of differentiated treatment, asserting that Caucasian employees had violated JetBlue's "Integrity" policy as well.  She claims that on one instance Jeffrey Palmquist kept a camera that belonged to a customer and that Sandy Lassen repeatedly used inappropriate language towards coworkers.  Palmquist was a supervisor, however, and as such he was not similarly situated with Plaintiff.  *See Amezquita v. Beneficial Texas, Inc.*, 264 Fed. Appx. 379, 385 (5th Cir. 2008) (holding supervisor of plaintiff was not in a similarly situated position as plaintiff for Title VII purposes.  Most significantly, JetBlue also persuasively argues that these allegations regarding Palmquist's and Lassen's conduct, if true, do not rise to the same level of public mistreatment of an officer of TSA, the government agency charged with airport security and with which JetBlue must maintain good relations in order to

operate its business. Plaintiff thus fails to assert that any similarly situated employees were treated differently for the same actions that formed the basis for Plaintiff's discharge. Accordingly, summary judgment will be granted to JetBlue on Plaintiff's claims of employment discrimination.

**B.  Intentional Infliction of Emotional Distress Claim**

Plaintiff's second claim is that JetBlue is liable for the tort of intentional infliction of emotional distress. It appears her claim is based upon the racial epithets that she allegedly suffered while working for JetBlue. She further adds that, due to her discharge, she suffered such distress when she was unable to attend her son's football game, which she could have done using JetBlue's employee discount.

To succeed in a claim for intentional infliction of emotional distress under Louisiana law, a plaintiff must prove the following elements: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *McCoy*, 492 F.3d at 563 (quoting *White v. Monsanto*, 585 So.2d 1205, 1209 (La. 1991)).

The Louisiana Supreme Court has explained that to recover for intentional infliction of emotional distress, "[t]he conduct complaint of must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to regarded as atrocious and utterly intolerable in a civilized community.'" *Id.* (quoting *White*, 585 So.2d at 1209).

24

Plaintiff here cannot sufficiently plead this first element of her claim. The Fifth Circuit has rejected claims for intentional infliction of emotion distress for acts that are of greater outrageous character. For instance, in *McCoy v. City of Shreveport*, 492 F.3d 551, 554, 563 (5th Cir. 2007), the Fifth Circuit affirmed summary judgment for the defendant where the plaintiff, a black city police officer, suffered harassment by a white subordinate who "twice [threw] wadded-up paper in her face and [] repeatedly enter[ed] her office only to stare at her and laugh in mocking derision." Similarly, in *Baker v. FedEx Ground Package System Inc.*, 278 Fed. Appx. 322 (5th Cir. 2008), the court affirmed the denial of a claim for intentional infliction of emotion distress where the plaintiff asserted that a coworker subjected her to "several racially insensitive comments" based on her race, including that "she did not want to work with people like" plaintiff, an African-American female, and telling her that "whites rule" and "this should be a lesson, Blacks cannot report to whites." Following this line of settled Fifth Circuit case law, it is apparent that Plaintiff's allegations that she was the subject of racial slurs from her fellow employees does not amount to the level of "extreme and outrageous" conduct that can allow Plaintiff to recover for intentional infliction of emotional distress.

Moreover, Plaintiff's claim that she suffered because she was prevented from seeing her son's collegiate sporting event due to her termination must fail because it does not reach the level of offensive conduct that qualifies for this tort claim. "[D]isciplinary action and conflict in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable." *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 514 (5th Cir. 1994) (quoting *White*, 585 So.2d at 1210). Employment disputes must have some quality that places them beyond the ordinary in order to qualify for intentional infliction of emotional distress. In

*Dean v. Ford Motor Credit Co.*, 885 F.2d 300 (5th Cir. 1989), the Fifth Circuit denied an intentional infliction of emotional distress claim where the plaintiff was denied a transfer to a higher-paying position because she was a woman, was called upon to do additional work, and was singled out for "special" annual reviews. The Dean court did permit recovery, however, for the plaintiff's claim that she suffered emotional distress because her supervisor intentionally planted company checks in her purse in order to make her appear that she was a thief, explaining that this conduct "is precisely what takes this case beyond the realm of an ordinary dispute and into the realm of an outrageous one." *Id.* at 307; see also *Wilson v. Monarch Paper Co.*, 939 F.2d. 1138, 1143 (5th Cir. 1991) (discussing *Dean*'s holding regarding intentional infliction of emotional distress in employment setting). Plaintiff has made no effort in her opposition to summary judgment to refute JetBlue's arguments. Therefore, summary judgment will be granted on Plaintiff's claim of intentional infliction of emotional distress.

## III.  CONCLUSION

For the reasons stated herein, accordingly,

**IT IS ORDERED** that Defendant JetBlue's Motion for Summary Judgment (Rec. Doc. 20) is **GRANTED IN PART AND DENIED IN PART.**  JetBlue's motion is denied as it pertains to Plaintiff's race-based harassment/hostile work environment claim.  JetBlue's motion is granted as to Plaintiff's national origin-based claims, her race-based discrimination claim, her retaliation claim, and her claim of intentional infliction of emotional distress.

New Orleans, Louisiana, this _____26th_____ day of January, 2009.

_____
       **STANWOOD R. DUVAL, JR.**
       **UNITED STATES DISTRICT JUDGE**